IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **TIFFENII S. MUMPHREY** | § | |
| | § | |
| Plaintiff | § | |
| | § | CASE NO. 2:05-CV-413 |
| vs. | § | |
| | § | |
| **TEXAS COLLEGE** | § | |
| | § | |
| Defendant | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Texas College's Motion for Summary Judgment (Docket No. 36). On October 26, 2006, the Court heard oral arguments on the motion. After considering the parties' written submissions and oral argument, the Court ruled from the bench and **GRANTED** in part and **DENIED** in part the motion.

**BACKGROUND**

On August 31, 2005, Tiffenii Mumphrey filed suit against Texas College (the "College") pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et. seq.), alleging sex discrimination that led to a hostile work environment and retaliation. In addition, Mumphrey brought state law claims for intentional infliction of emotional distress as well as negligent hiring, supervision, and retention.

Mumphrey was hired as Texas College's public relations coordinator on August 1, 2003. In Mumphrey's engagement letter, which was acknowledged by Mumphrey in writing, she was notified that her position was an at-will position. Mumphrey worked under Bridget Moore's supervision

1

until Moore resigned in February of 2004. John Matthews was also hired by Texas College in August of 2003 and was subsequently made Interim Vice-President of Student Affairs. Mumphrey did not report to Matthews at any time, but did have interactions with him at college meetings and functions.

Matthews made inappropriate remarks to Mumphrey on multiple occasions. Mumphrey complained to Moore, and Moore told Mumphrey to file a complaint with the human resources department. Mumphrey filed a formal complaint, and the College investigated Matthews. The College's Committee on Sexual Harassment convened on November 25 to discuss the complaint. The committee held hearings on November 26, December 1, and December 2, where it heard testimony from five individuals and twice from the parties. On December 4, the committee recommended to the President that Matthews be terminated.

The President terminated Matthews on December 30, 2003. After Matthews was fired, Mumphrey remained an employee of the College until she was terminated in May of 2004. Mumphrey contends she was terminated in retaliation for her complaint against Matthews. The College states that she was terminated due to a reduction in force necessitated by the College's financial condition.

On July 26, 2006, the College filed a motion for summary judgment. The Court heard oral arguments and made the following rulings from the bench: (1) Defendant's motion for summary judgment on Plaintiff's hostile work environment claim was **GRANTED**, (2) Defendant's motion for summary judgment on Plaintiff's retaliation claim was **DENIED**, (3) Defendant's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress was

**GRANTED**, and (4) Defendant's motion for summary judgment on Plaintiff's claim for negligent hiring was **GRANTED**.

## ANALYSIS

*Summary judgment standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). An issue of material fact is genuine if the evidence could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue for trial exists, the court views all inferences drawn from the factual record in the light most favorable to the non-moving party. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

*Title VII Claims*

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "'[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment.'" *Shepherd v. Comptroller of Pub. Accounts of the State of Tex.*, 168 F.3d 871, 873 (5th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). In order to establish a hostile work environment claim where a co-worker is the alleged

harasser, a plaintiff must prove: (1) the plaintiff-employee belongs to a protected class, (2) was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a "term, condition, or privilege" of employment, and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Id*. The College argues that the facts do not rise to the level necessary to affect a term, condition or privilege of employment, and alternatively, that the College took prompt remedial action once it learned of Mumphrey's allegations.

*Hostile work environment*

For sexual harassment to rise to the level of actionable hostile work environment conduct, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67 (internal citation omitted). "'A recurring point in [Supreme Court] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Shepherd*, 168 F.3d at 874 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). Moreover, implicit or explicit in the sexual content of the harassment must be the message that the plaintiff is incompetent *because* of her sex. *Hockman v. Westward Comms., L.L.C.*, 407 F.3d 317, 325 (5th Cir. 2004).

For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive. *Id.* To determine whether the conduct was objectively abusive, courts look at the totality of the circumstances, including: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive

utterance; (4) whether it unreasonably interferes with an employee's work performance, and (5) whether the complained-of conduct undermines the plaintiff's workplace competence. *Id*. at 326.

The threshold for conduct that creates a hostile work environment requirement is high. For example, in *Shepherd*, the defendant made remarks such as "your elbows are the same color as your nipples" and patted his lap when the plaintiff entered a meeting and said "here's your seat." *Shepherd*, 168 F.3d at 872. He also simulated looking down the plaintiff's blouses while she was at her desk and commented on the size of her thighs while he pretended to look up her dress. *Id*. The Fifth Circuit affirmed the District Court's grant of summary judgment holding that while the statements made by the defendant were "boorish and offensive," the comments were not severe enough to rise to the level of a hostile work environment. *Id*. at 874. The court stated:

> Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace. [The defendant's] harassing actions, although offensive, are not the type of extreme conduct that would prevent [the plaintiff] from succeeding in the workplace.

*Id*. (internal citations omitted).

Similarly in *Hockman*, the Fifth Circuit affirmed summary judgment for the defendant where the plaintiff claimed that the defendant harassed her in the following ways: (1) he once made a remark to the plaintiff about another employee's body, (2) he once slapped her on the buttocks with a newspaper, (3) he "grabbed or brushed" against plaintiff's breasts and buttocks, (4) he once held her cheeks and tried to kiss her, (5) he asked the plaintiff to come to the office early so that they could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands. *Hockman*, 407 F.3d at 328. The court held that the conduct in *Hockman* was arguably less egregious than that in *Shepherd*, and held as a matter of law, the conduct described by Hockman was not so

severe and pervasive as to affect the terms, conditions, or privileges of her employment. *Id*. at 329.

In the present case, the summary judgment evidence shows that there were five episodes of conduct.[1] All were verbal utterances, and none involved conduct that was physically threatening or humiliating. The first and second comments were not overtly sexual in nature, and on the third and fifth occasions Mumphrey's own questionable verbal conduct toward Matthews initiated the offensive conduct. Moreover, nothing in the comments explicitly or implicitly suggested that Mumphrey was incompetent because of her sex or otherwise affected a term, condition, or privilege of Mumphrey's employment.

Mumphrey attempts to distinguish *Shepherd* and *Hockman* by arguing that the conduct in the present case happened in a relatively short period of time (August 2003–December 2003), and that as a result of both the harassment and the alleged retaliation that followed, Mumphrey suffered panic attacks. The summary judgment evidence shows that Mumphrey did not begin seeking treatment for panic attacks until May of 2004, well over four months after Matthews was terminated and the comments had ceased. *See* Mumphrey's Exhibit A to Response to Motion for Summary Judgment. In addition, although the time period may have been relatively short, considering the totality of the

---

[1] First, while Matthews was waiting to meet with Moore in the public relations office, Matthews told Mumphrey that she was too cute to be pregnant. Second, while on campus to correct a paycheck problem during maternity leave, Matthews said "for you to have just had a baby, you sure fill out those jeans well." Third, during the week of October 21, Mumphrey went to take a photo of Matthews, and Matthews told Mumphrey that there was a rumor going around campus that they were having an affair and the baby was his. When Mumphrey informed Matthews that the back of his vest was unclasped, there was something Mumphrey said (which she could not recall) that led her to believe Matthews wanted her to button it. Mumphrey responded "I don't dress any other man but my husband" and Matthews responded "oh baby don't be so mean." Fourth, later on October 21, Mumphrey passed Matthews in the hall and Matthews told her not to get too close "or he might get a hard on." Fifth, on November 14, Mumphrey stopped off at Matthews' office to visit with his secretary and Matthews was fumbling with his earpiece. Mumphrey made a comment about Matthews' ears being small and Matthews responded that his ears were "the only thing on me that's small" and that he was "hung like a horse." *See* Defendant's Exhibit A to its Motion for Summary Judgment, excerpts from plaintiff's deposition.

circumstances and the other relative factors, Mumphrey's argument is not persuasive. As with *Shepherd* and *Hockman*, while Matthews' comments could be labeled boorish and offensive, they did not rise to the level required to establish a hostile work environment.

*Prompt remedial action*

Even if Matthews' conduct did affect a term, condition, or privilege of Mumphrey's employment, her hostile work environment claim still fails. To succeed, Mumphrey must also demonstrate that Texas College failed to take prompt remedial action after learning of the alleged harassment. *Hockman*, 407 F.3d at 329. "Prompt remedial action must be reasonably calculated to end the harassment." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir.1999)

The summary judgment evidence is as follows: Mumphrey first spoke to Moore after the first incident, but Moore did not construe it as a formal complaint. Mumphrey never used the word "harass" or otherwise indicated that she wanted to file a complaint. Mumphrey did not speak to anyone else again about the harassment until after the fourth occurrence, at which time Moore told Mumphrey to limit contact with Matthews to email only. Mumphrey ignored these instructions when she went to Matthews' office and made the comment about his ears, which resulted in the fifth incident. Mumphrey told Moore about the incident, and Moore instructed Mumphrey to go to human resources immediately.

Mumphrey argues that the College took an inordinate amount of time to deal with the complaint once it was lodged. On the day Mumphrey went to human resources (November 17), she filed a complaint, the President was notified, and so was Matthews. The committee held hearings

on November 25, November 26, December 1, and December 2. The committee recommended to the President that Matthews be fired on December 4, and Matthews was terminated on December 30. During this time, the College was closed for Thanksgiving and Christmas holidays, and the President had a pre-planned business trip and his wedding and honeymoon. In light of these events and holidays, the amount of time from the date of the complaint to the date of the termination was not unreasonably long. The Court holds as a matter of law that the College took prompt remedial action in terminating Matthews upon discovering his conduct.

Because Mumphrey has not raised a genuine issue of material fact as to the hostile work environment claim, the Court **GRANTS** Defendant's motion for summary judgment on this issue.

*Retaliation claim*

Mumphrey next claims that Texas College retaliated against her for filing a complaint with human resources and for Matthews' subsequent termination. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation and withstand summary judgment, Mumphrey must provide evidence of three things: (1) she engaged in protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) the adverse employment action was taken in response to her protected conduct. *Hockman*, 407 F.3d at 330. The parties do not dispute that Mumphrey satisfies the first two elements. The issue is whether Texas College fired Mumphrey in response to her filing a complaint against Matthews.

The College argues that it terminated Mumphrey due to a reduction in force, which it contends happens almost every spring at the College. Mumphrey points to summary judgment evidence that arguably demonstrates that the President's behavior toward her changed after the conduct with Matthews began. Mumphrey stated that the President sought to terminate Mumphrey as early as October 2003, after Moore made him aware of Matthews' first instance of conduct. The President also sought to terminate Mumphrey at a later date, but Moore refused stating Mumphrey was a good employee. Mumphrey stated that the President ignored her and refused to communicate with her after Matthews was fired.

In addition, to rebut the College's argument that it terminated Mumphrey due to a reduction in force, Mumphrey points to advertisements for a public relations position at the College that began running shortly after Mumphrey's termination. The College responds that the advertisement was for Moore's position, not Mumphrey's. Mumphrey also points to evidence that in other instances the College had saved money in response to the shortage by furloughing employees for the summer or reducing their hours, but Mumphrey was never given either of these options.

Mumphrey has pointed to sufficient summary judgment evidence to raise a genuine issue of material fact as to whether Texas College terminated her due to reduction in force or in retaliation for lodging her complaint against Matthews. Therefore, the Court **DENIES** Defendant's motion for summary judgment on this claim.

**State Law Claims**

    *Intentional Infliction of Emotional Distress ("IIED")*

    To prevail on her IIED claim, Mumphrey must prove: (1) the College acted intentionally or

recklessly; (2) the College's conduct was extreme and outrageous; (3) the College's conduct proximately caused Mumphrey's emotional distress; and (4) Mumphrey's emotional distress was severe. *GTE S.W., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999). Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Bruce*, 998 S.W.2d at 612.

The College argues that it is entitled to summary judgment on this claim on several grounds: (1) IIED is not available in sexual harassment claims, (2) IIED is not available if emotional distress is incidentally caused by another tort, and (3) the conduct complained of was not sufficiently extreme and outrageous. First, the College argues that IIED is not available in sexual harassment claims. *See Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004). In *Zeltwanger*, the plaintiff sued for violations of the Texas Commission on Human Rights Act and IIED. *Id*. at 439. The court held that IIED was "first and foremost, a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id*. at 447. "The tort's clear purpose . . . was to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied." *Id*. The court went on to hold that Zeltwanger could not recover for IIED when it would circumvent her recovery limitations under a separate state statute. *Id.*

Mumphrey does not dispute that IIED is not available when the conduct also gives rise to a statutory ground for recovery. Like the Plaintiff in *Zeltwanger*, Mumphrey argues that the conduct she relies on is not only Matthews' conduct, but also includes wholly separate conduct from the conduct she complains of in her Title VII claim, specifically, the President's conduct towards her after she complained about Matthews. Mumphrey says the President tried to have her terminated on multiple occasions, he refused to speak to Mumphrey, he gave Mumphrey dirty looks, acted as if her presence annoyed him, and gave instructions for public relations tasks to be carried out by Mumphrey to another person when Mumphrey was standing close by, as if she were not there. This conduct appears to be the same conduct relied on by Mumphrey in her retaliation claim under Title VII. However, the College argues that this conduct, even if wholly separate from the Title VII conduct, is not egregious enough to amount to the Texas Supreme Court's standard of IIED.

Whether conduct is "extreme and outrageous" is a question of law. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817 (Tex. 2005). "To be extreme and outrageous, conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bruce*, 998 S.W.2d at 611. Particularly in an employment context, "an employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct." *Id*. at 613.

Even if the conduct on which Mumphrey relies is sufficiently separate from her Title VII claim conduct, that conduct is not sufficiently egregious to satisfy Texas's IIED standard. *See id.* at 614; *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 741 (Tex. 2003); *City of Houston v.*

*Fletcher*, 166 S.W.3d 479 (Tex. App–Eastland 2005, pet. filed). The President's conduct, as set forth in the summary judgment evidence, does not go beyond the bounds of all possible decency so as to be regarded as intolerable in a civilized community. *Bruce*, 998 S.W.2d at 613. The conduct certainly does not rise to the level the Texas Supreme Court required in *Bruce*, where the manager-defendant's "ongoing acts of harassment, intimidation, and humiliation and his daily obscene and vulgar behavior, which GTE defend[ed] as his 'management style,' went beyond the bounds of tolerable workplace conduct."[2] *Id.* at 617.

Because the conduct Mumphrey asserts as support for her IIED claim is insufficiently "extreme and outrageous" as a matter of law, the College's motion for summary judgment with respect to this claim is **GRANTED**.

*Negligent Hiring/Retention/Supervision*

Mumphrey's final claim is a state-law claim for the College's negligent hiring, retention, and

---

[2] The conduct before the court in *Bruce* was as follows:
> [T]he employees produced evidence that, over a period of more than two years, Shields engaged in a pattern of grossly abusive, threatening, and degrading conduct. Shields began regularly using the harshest vulgarity shortly after his arrival at the Nash facility. In response, Bruce and Davis informed Shields that they were uncomfortable with obscene jokes, vulgar cursing, and sexual innuendo in the office. Despite these objections, Shields continued to use exceedingly vulgar language on a daily basis. Several witnesses testified that Shields used the word "f---" as part of his normal pattern of conversation, and that he regularly heaped abusive profanity on the employees. Linda Davis testified that Shields used this language to get a reaction. Gene Martin, another GTE employee, testified that Shields used the words "f---" and "motherf---er" frequently when speaking with the employees. On one occasion when Bruce asked Shields to curb his language because it was offensive, Shields positioned himself in front of her face, and screamed, "I will do and say any damn thing I want. And I don't give a s--- who likes it." Another typical example is when Gene Martin asked Shields to stop his yelling and vulgarity because it upset the female employees, and Shields replied "I'm tired of walking on f---ing eggshells, trying to make people happy around here." There was further evidence that Shields's harsh and vulgar language was not merely accidental, but seemed intended to abuse the employees.

*Id*. at 612.

supervision of Matthews. Mumphrey must prove: (1) the College has a legal duty to hire, supervise, or retain competent employees; (2) the College breached this duty; and (3) the College's breach was the proximate cause of Mumphrey's damages. *EMI Music Mex., S.A. de C.V. v. Rodriguez*, 97 S.W.3d 847, 858 (Tex. App.–Corpus Christi 2003, no pet.). The College argues it is entitled to summary judgment on this claim because it did not breach any duty owed to Mumphrey as a matter of law.

The College asserts that it cannot be liable for any negligence claims in absence of any underlying common law tort. *Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App.—San Antonio 1999, no pet.). In *Gonzales*, the Texas Court of Appeals stated:

> Sexual harassment has never been a common law tort; as a cause of action, it is a statutory creation. A negligent supervision claim cannot be based solely upon an underlying claim of sexual harassment per se, because the effect would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law. Moreover, if we allowed a sexual harassment finding to supply the basis for recovery on a negligent hiring claim, the statutory procedures and limitations applicable to such claims would be rendered superfluous. Accordingly, negligent hiring will be a viable cause of action in a sexual harassment case only if the harassment encompasses misconduct that is independently actionable under the common law, such as battery or intentional infliction of emotional distress.

*Id*. at 740. (internal citations omitted). Mumphrey argues that the underlying tort in this case is the IIED claim; however, the Court has held that Mumphrey cannot establish a claim for IIED, and therefore there is no underlying tort claim. *See Proctor v. Wackenhut Corrections Corp.*, 232 F. Supp. 2d 709, 714 (N.D. Tex. 2002) (holding that a plaintiff in a Title VII case could not establish a claim for IIED and therefore, could not prevail on her negligent hiring claim due to lack of an underlying tort.)

Because Mumphrey cannot establish an underlying tort on which to base her negligent hiring claim, she cannot prevail on the negligent hiring claim and the Court **GRANTS** Defendant's motion with respect to this claim.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant's motion for summary judgment with respect to the Title VII hostile work environment claim, the claim for intentional infliction of emotional distress, and the claim for negligent hiring, retention, and supervision. The Court **DENIES** the motion with respect to Plaintiff's retaliation claim.

**So ORDERED and SIGNED this 5th day of December, 2006.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**